Case number 24-5159, Chanada Robinson et al. v. City of Knoxville, TN et al. Our argument is not to exceed 15 minutes for the plaintiffs and 15 minutes to be shared by the defendants. Ms. Held, you may proceed for the appellants. Thank you, Your Honor. It's an honor to be here. I also have the honor of representing Chanada Robinson, who is the mother of the decedent, Anthony Thompson, and also Graylyn Strong, who is Aunt Thompson's best friend. Thanks for putting up with me. We have at least five issues and 15 minutes to answer your questions, so I'm going to get right to the point. First, on the morning of April 12, 2021, four officers arrived at a bathroom at Austin East High School in Knoxville, TN to arrest Aunt Thompson on a charge of domestic violence. They did not have a warrant. Brings me to the first point. The law in the circuit is clearly established that the Fourth Amendment protects suspects from unreasonable arrests. Warrantless arrests, like the ones in this case, are presumed unreasonable and therefore unconstitutional. In terms of the lack of a warrant, were there exigent circumstances arising from the fact that this was a minor and he was located in a school and the complaining witness had told the police that he might have a gun, that she didn't know if he had a gun with him or not?  Wouldn't that make the situation a little more urgent that the police get in there and locate the suspect and make sure he wasn't armed? Theoretically, but that would not be consistent with the facts in the case in that the officers, if you watch the video, from their demeanor and even from their admissions in the pleadings before the trial court, admit that they did not know or believe that he had a gun on him at the time. Well, that's because the young lady who was the alleged victim said that he might have a gun, but she didn't know whether he had the gun or not. But she raised the point that he might be armed is what she told the police. Specifically, the policeman asked her if she thought he had a gun and she said, I don't know if they have clear backpacks. And in fact, he did turn out to have a gun on him. He did, but the police did not know that and they did not act as if they knew that and they never brought up that they knew that, even in the court below. So the fact that they did not have a warrant was in no way related to whether he had a gun or not. Well, did they have enough reasonable suspicion to go and talk to him? I would say yes, but not about the gun. I mean, they did have reasonable suspicion to talk to him about whatever they wanted to talk to him about, but that's not why they were there. They were there by their own admission to arrest him on a charge of domestic violence, not on any kind of reasonable suspicion or charge that he had a gun. Okay, but I guess I don't know what that has to do with anything. I mean, they went into the bathroom to talk to him, right? They testified or they admitted that they went into the bathroom to arrest him. Okay. Well, they had probable cause to arrest him for threatening her? They did.  So tell me what that turns into. They had probable cause to arrest him, but they still needed to have a warrant. They had to have a warrant to arrest him. They did not have a warrant. Therefore, this was a warrantless arrest. To arrest him without a warrant, they had to point to one of seven exceptions, and there weren't any. Well, was it clear that he ever was arrested? They accosted him, and I guess they were trying to – it's unclear whether they were in the process of arresting him or whether they were simply interrogating him, but they were trying to find out if – well, he wouldn't obey the officer's commands to take his hands out of his pocket, and they got into a tussle. That's when the gun went off. That's what they say. Well, that's what's on the video from the officer's body camera. What's on the video from the – now, we're shifting gears to point number two, okay? But to go there, on point number two, if you look at it at 3-12-2-18, you'll see that Officer Wilson says, get your hands out of your pockets. At that precise second, Officer Baldwin grabs his left arm like this, okay? He takes his hand out of his left pocket, and Baldwin grabs him. At 3-12-19, the very next second, Wilson repeats, get your hands out of your pockets, okay, and grabs his right arm. Under Perez, it is clearly established by this circuit that you've got to give him time to comply. He literally had not even one second to comply with officer's commands. I'm not sure that's what the body cam shows. He clearly is refusing to take his hand out of his pocket. You've got to look at the time stamp, Your Honor. At 3-12-18, the first request comes. You've got to listen to the audio, and Baldwin grabs him. At 3-12-19, listen to the audio. Wilson tells him to get his hands out of his pockets a second time and simultaneously grabs him. The video evidence on standby clearly shows that. Okay, so what was wrong with that? You have to, under the clearly established law of this circuit, give somebody time to comply before you exercise force. Okay, so this is a force. You're saying excessive force, taking his arm out. Grabbing his arm rather than giving him a chance to comply, yes. Now, if there had been a delay of several seconds, even several seconds, it might become a jury question. I guess the jury could ask the question you're doing, Judge, but you've got to look at the video. But if we're subject to interpretation, if somebody can look, if you can look at that video and I can look at that video, and in good faith say, I say he had no time to comply as a reasonable person. But the excessive force is grabbing the arm, right? Yes. And is there clearly established law on that? Yes. That that's not de minimis force? I mean, we've got cases that say that certain things are basically just de minimis. I mean, is grabbing somebody's arm? Well, I mean, in the end, it was far more than grabbing their arm. I mean, basically the law is that they can't start the argument, right? They can't start the physical altercation by laying hands on a compliant subject. After they laid hands on him, yeah, there was a struggle with a young man saying, 17-year-old kid saying, wait, wait, wait, what are you doing? Stop, hold up, wait, wait, my bad, my bad. Those are not the words of someone who's resisting arrest. Those are the words of a 17-year-old child accosted by four. We compartmentalize all of it, right?  The force, every use of force is compartmentalized. And so your complaint here is they grabbed his arm. That's the compartment we're in, right? That's what started it, yes. And they didn't have a right to do it at that moment because he was not compliant. Okay, but why is that? Because he was. What's the consequence? What is the consequence of that? Of his compliance? No, what is the consequence of the fact that they shouldn't have just grabbed his arm out? Nothing happened when they grabbed his arm out, right? Well, when Baldwin grabbed his arm, he flinched, right? And that was at the precise second that Wilson said the second time, get your arm out, and then he grabbed his right arm. So he's like this.  And then six seconds later, while he's like, what is going on? Wait, wait, you know, wait, wait, my bad, my bad. Six seconds later, Officer Clabo reaches in to his pocket, and it was at that moment, actually, that the gun went off. Now, the video's not clear. I don't want to overstate my case. The video's not clear who all's hands were in what position in what pocket. Looking at it one way, I tell you, it looks like his hands were here, and it was just Wilson and Clabo that had their hands in his pockets, okay? A fact that if I ever get to a jury, I'm going to bring up the fact that there are no powder test results from his autopsy showing.  No gun powder on the decedent's hands if I ever make it to a jury, which would tend to support the idea that this young man's hands were not in his pockets at all when the gun went off. But that's not necessary for us to talk about today. Today, we're in front of you on qualified immunity, and the issue is freedom. I'm not sure why you would get to it. What would that be relevant? Which claim would that be relevant to? Excessive force. In shooting him? Yeah. I thought that wasn't at issue. It's not the point I'm standing here before you today to make, and I am at a stop according to my little timer. So I'm going to step away. Thanks. I mean, I think we usually get to control who's asking the question.  Sorry. I'm not sure whether Justin and Vandy might have had another question. I'm okay, Judge Clay. I'm finished. I think Judge White might have. Could you come back up here a moment? Never mind. Never mind. Do you have more questions? Well, are you representing both plaintiffs? Yes. Yes. There's technically three or four. I'm sorry. What? Shannon Robinson for herself, for her son, as next of kin, and Graylin Strong. Yes. I represent all three plaintiffs. Did you have any argument on? I didn't get there. Huh? I didn't get there in the time before my little light turned on. Well, we can override the time if we want to. Could you come back to the podium? Yes, sir. Your Honor. Sorry. What is your argument as to Strong? So that's point four. Going to Mr. Strong's argument, we concede that they had the right to detain him under Terry. But Terry stops only allow you to detain and question somebody on reasonable suspicion. And once you have determined that they are neither a threat nor have committed a crime, you have to let them go. So six minutes after Ant was shot, the video cameras show Officer Clabo comforting him and saying, and he asks him, he says, did I do anything wrong? Am I in trouble? Graylin does. And Officer Clabo says, no, man, you're good. And we just sit tight. Everything's going to be okay. And he does. After that, about eight minutes later, Clabo stands him up and walks him cuffed over his best friend's body to the door where he hands him off to a sergeant, still cuffed, and says, he's involved. What do we do with him? He said, what? He's involved. What do we do with him? And from there, another sergeant marched him across that we did not see, marched him across the hall, out the front door to a waiting police car, put him in the back and took him downtown. Did you sue the? The sergeant? No. Did you sue the people who detained him? We sued Officer Clabo, who was who detained him in the bathroom.  One thing I wanted to ask you is, in Plaintiff's brief, there's a statement that the plaintiffs concede that Officer Clabo may have been justified in shooting Mr. Thompson, but not in shoving him around. Now, why isn't that statement a concession of the allegation, against the allegation that the decedent was improperly shot? If I understand your question correctly, there's two, and respectfully to Judge Nalbandian, did I say your name right? Nalbandian's point, we analyze these in segments, right? So, it was Wilson and Baldwin that grabbed him, which is the first instance of excessive force on a compliant suspect. Clearly unconstitutional, clearly established law. About six seconds into this business going on, Clabo steps in, puts his hand in Ant's front pocket where the gun is. That's not shown on the video, is it? It is. It's on Officer Clabo's video. Showing that he's got his hand in the young man's pocket? Yes. All right. That's easily confirmable with that. Yes. I mean, I can get you the time stamp and look it up. And what is your allegation of what happened then? At that point, the gun goes off. We do not know that Officer Clabo or Officer Wilson or Ant is who caused the gun to go off. The video doesn't. It's not clear. I don't want to overstate that. We don't know. But it did go off. At that point, the young man still has his own hand in his pocket. It was out, it was in, there was struggle. Two cameras fell off, the officers, the views are obstructed. You can't tell. Okay. And you're not facing any claim on the gun going off, right? Or are you? We're saying that we don't know why Ant's gun went off. You can't tell from the video. But what we're saying is that from the perspective of the officer on the scene, Officer Clabo, and I'm trying to answer your question, Your Honor, from the perspective of the officer on the scene, Officer Clabo, at that point a gun's gone off. People are moving around and he shot him. I didn't hear what you said. From the perspective of Clabo of what? From the perspective of Officer Clabo, at the moment that the gun went off, it is reasonable for that officer to believe that somebody shot a gun and somebody's at risk and for him to use deadly force. Okay. But he did, okay. What was not okay was for him to participate in skirmish. Okay. And then what about the medical, the failure to treat claim? Oh my goodness, that's heater. Y'all just ruled on that in 2018, I think it was. If I'm not mistaken, you were on the panel, Judge Clay, and that was where you all held that under prior clearly established precedent, an officer doesn't get to just call 911 and do nothing else. They get to secure the scene. They get to assure their own safety. But then they don't get to just stand around and wait for 911 to arrive. They've got to, in this case, what the officers did is they bumped fists, just congratulating each other, yeah, everything's okay. They argued with Graylin Strong. They reattached their body cameras and checked their legs to see, you know, if their socks were pulled up. I mean, they did everything except attend to a boy who's bleeding out, who's obviously bleeding out in what is just excruciating to listen to. Graylin Strong's begging them to help his friend. They knew, I mean, he's laying in a pool of blood. At least in Heaters, the officers showed Mr. Heater the dignity of lifting his head out of the pool of blood. Even that dignity was not offered to Anthony Thompson. I want to make sure I understand your answer to the question regarding the statement in your brief that Officer Chabot may have been justified in shooting Mr. Thompson but not in shoving him around. Could we take that as a concession that the use of deadly force was reasonable? Yes. To Officer Chabot and the circumstances that he knew at the time, yes. All right. The issue that makes this so hard for me to answer your question, Your Honor, is he wasn't justified in creating those circumstances by participating and shoving that boy around. Okay. Do I still get rebuttal? Thank you for your additional argument, and we'll hear from the defendants. Please, Your Honors, my name is Morris Kaiser from Knoxville. I represent Officer Jonathan Clabo in connection with this matter. I'm requesting seven minutes. My other counsel will have their time as well. At any rate, if Your Honors please, let me say at the outset that Officer Clabo definitely did not violate any of Mr. Thompson's clearly established constitutional rights. He's clearly entitled to qualified immunity. In fact, he did not violate any rights of Mr. Thompson. We misheld the plaintiff's counsel and conceded that probable cause existed. The officers went to Austin East. It turns out, based on the Tennessee Bureau of Investigation comments, that the young man had been sitting in the bathroom for 20 minutes. He was not using the bathroom. He was sitting on the toilet. His pants were up, but he wasn't using the bathroom. The door to the stall was open. They came in. They asked him to stand up. After some delay, he finally did. But when he stood up, he put his hands in his pockets. Officer Baldwin, on the left side, the officer said, get your hands out of your pockets. Get your hands out of the pockets. A very reasonable request. And Officer Baldwin pulled his hand out of his left pocket, but he would not bring his hand out of his right pocket. We know why he would not, because there was a gun in there. The situation was, he was not compliant and more often, actually, he was resistant. He resisted any effort to get his hand out of his right pocket. And then the gun went off. His gun went off in his pocket. It was aimed toward Officer Baldwin. Officer Clabo, who was on the right hand, at that point trying to control the gun, trying to get control of the hand that had the gun, and then he fired his gun at Mr. Thompson. And then Ms. Held has conceded that that was a justifiable shooting, which under any review of that tape is clearly the situation. And I can tell that your honors have reviewed the tape. The tape is subject to only one interpretation, and those are the facts. And on that tape, there's no genuine dispute as to any material fact that there was no excessive force in connection with this. Then as to Strong, as soon as the second shot was fired, Strong suddenly appears behind Officer Clabo at his back. Officer Clabo, nobody knew that Strong was in the bathroom. Officer Clabo took him down, secured him as best he could, checked him, and so forth. And the Plaintiff's Counsel has made some concessions about Mr. Strong as well. On page 8 of their—I'm sorry, on pages 20 and 35 of the brief, the plaintiffs have conceded that the detention was reasonable at its inception, but it became unreasonable after such— Are there any cases either way on whether arresting somebody in a school bathroom, I guess, is a public place, or whether you'd have a reasonable expectation of privacy there? Well, your honor, it was not a search. It was not a situation where they had cameras and— I'm talking about an— I'm sorry? Either way, like a seizure, an arrest. Is it a public arrest? It's a public arrest, your honor. And he was not treating— Okay, but are there any cases either way? Well, he was not treating the bathroom as a public place. He was sitting in there with the stall door open, with his pants up, just hanging out. He'd been in there for 20 minutes. It was not like a normal use of a bathroom that somebody would think of. Okay, but I'm just wondering if there's any relevant case law. I'm curious. I do not have any, quote, to your honor. Okay. But it's not his home, obviously. It's not like Payton, where you're in your own home. That's correct. Payton was at the house. There's no question that Payton has no applicability here in this case. So, by the way, Strong did not file a proper notice of appeal. That's set forth in my brief, and I don't think, of course, that's jurisdictional, but I say that just to alert your honors that that's in there. Then the concession about the detention was that at such time as Anthony Robinson was declared dead, then the exigency of the situation was over with and that he should have been released. The reality is after the medics walked out the bathroom door, 20 seconds later, Officer Clabo was taking Strong out the bathroom door. He walked a short distance to the front door, saw his sergeant. His sergeant said, I'll take charge of him. At that point, Officer Clabo could have no responsibility for any further detention. So it's such a short period of time, 20 seconds after. But he also says he was involved, right? I beg your pardon? He also says he was involved, right? He was involved to the extent that after the second shot was fired, he made contact with Clabo's back. Now, he could have been charged. He could have been charged with interference. He was not charged by Clabo, but he could have been. At any rate, I want to talk briefly about the medical issue, and I've read the Heater case, and certainly in that case, in this case, we're relying on the Wilkerson versus the City of Akron case, and that case was spoken of favorably in the Heater case, and that would have been on page, let's see, these are Lexis page numbers, but it's page 17 of that. That's where Wilkerson indicated two officers. The opinion says two officers on the public street were not deliberately indifferent, where there was no allegation. Officers had first aid training. They urged the ambulance to step it up and attended and encouraged the injured as the ambulance came. And that's what happened here. Within 30 seconds of the time that the shot was fired, the 1081 code was called, which is bring everybody. Bring the firefighters, bring the ambulance, bring everybody. Bring the medics. And within a minute of that, another call, bring two ambulances, and within 30 seconds of that, two urgings, step on it, step on it. The plaintiff has not alleged that the officers had any special first aid training whereby they could have rendered any first aid that would have helped this young man at all. So the facts are really the Wilkerson facts, which say basically if the aid is summoned quickly. I'm out of time, Your Honor. Let me ask you this. The video seems to show Officer, after Thompson was shot, the video seems to show Officer Cash sitting on top of Thompson, and all that weight, the man is bleeding, all that weight is being put on him. And at that time, seeming not to be rendering any medical aid or any aid at all, but he's sitting on him for a period of time. It's hard to understand why the officer is doing that. Well, Your Honor, I don't know. I'll let his counsel speak to that, but Officer Cash then turned him over and got the backpack off and so forth, made the scene appropriate for the medics to come and render the care. And there's no allegation that these officers impeded the medics at all. I'm out of time. Thank you, Your Honors. All right. Thank you.  Your Honors, I'm Nathaniel Craigstrand. I'm here for Lieutenant Stanley Cash, Officer Brian Baldwin, and Officer Adam Wilson. Maybe you can explain that in terms of the issue of rendering medical care, why Officer Cash was just sitting on the injured person and not seeming to render care, but just sitting on him while he was bleeding on the floor. At that point, if you look at his vantage point, he did not understand the extent of his injuries. From like 1300 to 1330, he's still trying to secure his hands and still believes he's resisting. And so at that point, that's— I know they kept trying to put handcuffs on, but he didn't appear to be resisting. He was pretty limp, just bleeding, and he's on his stomach. And I'm not sure why they were trying to put handcuffs on at that point. At that point, from his perspective at the scene, he did believe he was still resisting. He still believed that he was resisting, still believed he needed to secure the scene at that point. He called at 1421 when he does—and you can hear him talking through the 1300s, saying, hey, Anthony, hey, Anthony. You can hear who talking? You can hear Lieutenant Stanley Cash talking to Thompson, saying— basically tapping and talking to him, trying to get him awake, as he does through a lot of this episode. And at 1421, when he rolls him over, that's when he realizes the extent of his injuries. And you can hear him say, step it up, step it up. And then 1400, he also calls again for the ambulances. And you can see he takes efforts throughout this. 1500, he's sitting there trying to cut off the backpack. So in that time period that you're specifically asking about, Justice Clay, he doesn't have that knowledge because he's not sitting from the perspective that others, that he realizes that there's that pool of blood. And it's a chaotic scene. I think we can all agree on that. We're sitting in a school that's about to let out. They didn't want to—I mean, they didn't expect there to be a gun there. I'll concede that, except for the fact that they knew that there was potential when he leaves the school that the gun could be there. I don't want to stray to the excessive force because I know we're on medical care. But they didn't expect this scene. It was chaotic. You've got a school that needs to be controlled at that point. And he does not know the extent of his injuries. So that's why he's sitting there for those 30 seconds to a minute saying he just doesn't realize that. And going to the—just to stay with the medical care claim, we recognize that Heater's out there, but this is not— it obviously has some overlap with Heater, but it's not that case. And Officer Bowers in that case, one of the key points that the court highlighted in that is that he didn't think the decedent in that case was a threat still because he told one of the officers go put on gloves to help treat him. You don't have that here. Lieutenant Stanley Cash immediately went to not putting on gloves. He's trying to secure him. This is not like Heater in the fact that Officer Bowers was basically standing to the side for three minutes not doing anything. You don't have that here in this case. Lieutenant Stanley Cash was taking action, calling ambulances. You can see on the video he's tapping him saying, hey, like Anthony. He's cutting off the backpack. He's trying to get the knife from other officers so that he can—so that people can come in. He's also making sure that the walkways clear so that when the medics do arrive. It's not like the Scazzari case or it's not like the state of Owensby. It's not like Jones where there wasn't any action to make sure that— The Scazzari case is one of those ones where they had to delay for two minutes once the medics got there because they hadn't done anything to secure the scene. That's not this case. And it's not in the state of Owensby either in the fact that there wasn't 11 cops standing around after they beat the guy. So this is more in line with the Wilkerson case where Lieutenant Stanley Cash and Brian Baldwin were taking action to secure the scene, were doing things that were there to provide medical aid to him or at least clear the way so that others could provide medical aid. Turning back to the seizure case, I think my colleague, Mr. Kaiser, covered some of this, but warrant wasn't required at that point. It was an arrest in a public place. To Justice Nobondian's question whether there's a case on point directly or whether this holds that, I was not able to find one in an arrest context. However, there are several search cases that we cited in our brief that we suggest or indicate that it is considered a public restroom assessment, public place, especially considering the facts of the case, as Mr. Kaiser highlighted. It's an open stall. It's not closed. People were able to walk in and out of it. To Justice White's point, I think Devin Peck versus Alford kind of dictates if you've got reasonable grounds to perform a seizure, whether it's reasonable suspicion or it's probable cause, if you've got those grounds, it doesn't matter what the intent was and when you made that. So we submit that the arrest of Anthony Thompson or the attempted arrest of Anthony Thompson was objectively reasonable under case law. As to the excessive force in response to Ms. Held's factual argument, there were opportunities for, they did give opportunities for him to comply. They asked him to get his hands out and he had two seconds to do that. But as Justice Nobondian pointed out, that's not required when you're just using soft hands to effect an arrest or a detention. It's more in line with the Wright versus Euclid case and the Collins versus Nagel case where Graham dictates that you can use some type of force to effect a seizure. And we submit that that was the seizure in this case and the force used was objectively reasonable. So if he was just passively resistant? Well, when we talk about the dichotomy about the active versus passive resistant in the cases that she's cited to, a lot of those are tackled. A lot of those are taser cases. I've searched through all those. Those are ones where they, or the Griffin case, where they jump to a neck restraint. That's not this case. This is a case where it's soft hands. It's not this massive jump. Now, we do submit he was actively resisting because he was not only noncompliant for two seconds when they asked him to get his hands out, but he also used his body to keep them from getting his hand out of the pocket. So we do submit that that was active resistance. And such as the Jackson versus, and hopefully I'm saying this correct, Washtenaw County case that was cited in plaintiff's brief, they actually said he was noncompliant and then he put his hands around his waist. And they considered that active resistance. So we submit that the excessive force was certainly, or the force was objectively reasonable. We submit that they're titled to qualified immunity. The case law, Mullenix versus Luna, says qualified immunity doctrine is protect officers between a hazy border between constitutional and nonconstitutional conduct and Wilkerson and all the other force. The Wilkerson case is in medical care claims. There's not, with that out there, the constitutional question is not placed beyond debate based on the facts of this case. Thank you. Thank you. Hey, police and court. I'm Ronald Mills and I represent the city of Knoxville. I have a very few simple points to make so I won't belabor them. We are in complete agreement with the officers that the district court properly granted summary judgment to them and therefore ultimately to the city of Knoxville. The city noted in its brief that it was being filed in an abundance of caution because the notice of appeal indicated only that the plaintiffs were appealing from the district court's order of January 16, 2024, which denied their motion to alter or amend the order of granting summary judgment to the individual officers. And it did not mention the district court's February 14 order granting summary judgment to the city or the February 14, 2024 order that dismissed the action in its entirety with prejudice. Federal Rule of Appellate Procedure 3C1B says that the notice of appeal must designate the judgment or the appealable order from which the appeal is taken. And that simply hasn't happened here. In the absence of a notice of appeal of either the order of granting summary judgment to the city of Knoxville. It hasn't happened with respect to your client. To the city of Knoxville, that's right, Your Honor. And in the absence of either a notice of appeal granting the motion for summary judgment on behalf of the city or the dismissal. I take it your argument, well, that's a final order. It hasn't been appealed from, even if we were to remand on some of the claims, I take it your position would be it doesn't matter. You would be out of the case. That's correct, Your Honor, because there was no appeal taken from the judgment against the city. Okay. The claim against the city was what? The federal claim is a Menil claim, Your Honor. Policy custom fair to train. And there were also some miscellaneous state law claims that were attached to that as well. In any event, regardless of the issue of the notice of appeal, any claims against the city of Knoxville have been waived because they weren't contained in the plaintiff's leading brief. They just weren't mentioned in there. In fact, there were only two mentions of the city of Knoxville at all in that brief. And one of them was, I believe, in the caption, and the other was with regard to the statement of the case. So I think those issues in and of themselves are sufficient to leave the judgment in favor of the city of Knoxville undisturbed. Leaving those issues aside, the district court granted summary judgment to the city on the civil rights claims under Section 1983 because there was a finding that there was no underlying constitutional violation by the officers. The district court cited the Chambers case. The district court could have cited any number of other cases for the proposition that without that underlying constitutional violation, there's no liability to the city. I see that I'm out of time. I could address those state law claims, but I will stand for any questions the court may have otherwise. Thank you very much. Any rebuttal? Your Honor, should she be afforded her seven-minute rebuttal request? Yes. Thank you. To your question, Judge Van Dien, I welcome the opportunity to say your name right. I apologize if I'm butchering it. Case law on the issue of student privacy interest, there is case law. What the case law holds is that children who are at school have a reduced privacy interest. They do not, however, have no privacy interest. That's the Veronica case. That's a 1995 case. It says it's a reduced privacy interest. The next case that is on point is the Branham case. That is a 2008 case, and I love that case because it tells us that we are not required as attorneys to leave common sense at the courthouse door. That case involved surveillance of kids in dressing rooms because there had been issues in that case of some violence and some problems in the dressing rooms. The court said, no, man, you got common sense says that you don't just get to watch people in the dressing room. That level of privacy interest still exists. Is it the same as in the person's home? No. But when you're analyzing exigency, Katz has told us since 1967, I even have it here, these considerations do not vanish when the search in question is transferred from the setting of a home, an office, or a hotel room to that of a telephone booth. Wherever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures, in this case, absent exigency. The officers never really said it, but I knew it was coming. They talk about the exigency, and when you have exigency, it requires the court under clearly established law to balance the student need of privacy against the officer's need to act without a warrant. The Graham analysis applies. You consider the severity of the- I'm sorry. I just want to make sure we're focused on the right thing.  So we're not talking about a search. Right. Okay. We are talking about an arrest without a warrant. Yes, ma'am. Well, it turned into, you could say- An attempted arrest. Okay. It started as a Terry discussion. You don't need a warrant to initiate a Terry discussion, and you don't need a warrant to arrest. What you needed in those other cases is, because you were performing the arrest in someone's home, you needed a search warrant as well because you were crossing the threshold. You were- Now, I think, are you saying that if you want to arrest someone in a bathroom, you need to get a probable cause, a judicial probable cause determination first? I am saying that warrantless arrests are presumed unconstitutional unless an exception applies. The exception that could conceivably apply in this case is exigency. If you were going to proceed under a theory that exigency justified the not getting a warrant part, then you have to weigh the student's interest in privacy against the officer's interest in acting quicker than they can get a warrant. Now, they say he didn't have- Even if he didn't have much of an interest of privacy in the bathroom, he had some interest, right? Well, let me ask you this. If the police are told that a child in the school might have a firearm or a handgun, doesn't that remove all these restraints of being concerned about the child's privacy rights and all of that until the police can assure public safety by getting in there and getting that gun away from the person? If there is a gun in there? The reason I'm having so much trouble, because you've asked this a minute ago, and the reason I'm having so much trouble answering your question directly, Your Honor, is that the record is pretty clear that none of the officers believe that he had a handgun. For example- We don't know what they believe, but we do know that the alleged victim had told one of the officers that he might have a handgun. She didn't know whether he had the gun on him or not. They at least have been told that. I'm not sure if I understand your question. Is the question, as I understand it, that- Well, in other words, arguably were there not exigent circumstances that would have permitted the officers to go in and look for the young man to see if he had a gun without getting a search warrant and all of that? Arguably, yes. Theoretically, yes. But in this case, no. These officers all, if you look at the video, their demeanor, their statements to the TBI, none of those officers believed he had a gun, and the law tells us that we are to accept the officer's perspective. How do you know that they didn't think that the young man had a gun? How do you know that? Because nothing in this record says that they did, and plenty says that they didn't. Well, let me ask you this. On one of the school videos, there's a video, I think it was from the day of the incident- Yes, sir. Showing Thompson physically abusing the young lady in the hallway. He pulls her hair, knocks her around, pushes her up against the wall and all of that. Do you know whether or not the officers had seen that video or was aware of that video before they went to the bathroom? Yes, they absolutely saw the video. The issue is the interpretation of the video. Where the video is vague, Judge White, you've ruled this, where the video is vague and subject to multiple interpretations, it has to be interpreted in a light most favorable to the case and less clearly contradicted. No, that's different. That's if you're looking at a 1983 claim, etc. But in terms of the officers, do we have to assess what they reasonably- Absolutely. I want to make sure I understand your argument. Are you saying that the officers violated the law when they went into the bathroom? No. Okay. Are you saying that they violated the law when they engaged with him when the stall door was open and he had his pants up? At that moment, it's so hard to find the moment. You know, these things evolve. Certainly by the moment that they laid hands on him, on his arms, without giving him a chance to comply, that was a violation. Okay, but I'm asking a different question. I realize this may have been ambiguous. You've made claims of excessive force. Yes, ma'am. And then you've also made claims that they violated the Fourth Amendment because he had an expectation of privacy. Yes. Okay, so my first question is regarding the privacy. I'm only talking about the privacy now. Did they violate the law when they went into the bathroom and you said no? Well, I- I mean, isn't it a privacy interest as it relates to an arrest, right? Your argument is they arrested him in a non-public place and needed an arrest warrant. Yes, that is my argument. And they're saying they didn't need an arrest warrant because it's a public place, and now we're debating the question about whether a school bathroom is more analogous to the home in Payton or more analogous to, like, walking on the street and getting picked up by the cops. See, I'm struggling because it's neither one of those. We have no privacy interest in walking on the street. We have all kinds of privacy interests in our home. The bathroom's somewhere in the middle, right? But what I am saying that matters is that where it's in the middle, you have to weigh. You have to weigh the student's interest in privacy against the officer's interest in acting quickly and without a warrant. But isn't the law not clearly established if we're in the middle and we don't have any case law that specifically says either of that and we're in the context of a civil rights suit and qualified immunity? I am so glad you brought that up because, in fact, there are three ways that we can establish that a law is clearly established. It's clearly established that a law is clearly established. But what's the case? Do you have a case on this arrest point? What's the best case? Is it Payton? No. It would be Katz, 1967, U.S. Supreme Court case that says that where— The reasonable expectation of privacy. The reasonable expectation of privacy. Okay. Thank you. Now, there's three ways to establish that something's clearly established. I love talking in circles like this. One is the point that Your Honor brings up, which is that there's a case on point, but there's also when there's a constellation of persuasive authority, and then there's also just good old common sense. You don't bust in on a kid in a bathroom stall and to the point that he had his pants up and was looking on the phones. Well, you didn't know that when you busted in. That's the privacy interest and when the privacy interest got implicated. Any other questions? No, apparently not. Thank you so much for your arguments on both sides. Your Honor, I'm sorry. Oh, that's right. You have— I don't fault the court. I'm just saying Ms. Hales had some additional time. Could I make one more point about privacy? Yeah, yeah. Yeah, excuse me if you have some more time. I don't have any rebuttal time, Your Honor. You don't have any rebuttal time? Due to the additional time she was afforded, I would like to make one more point. All right. Why don't you do that? And that is simply that Ms. Hales did not say anything in the opposition to the summary judgment motion about the bathroom being a private place. That was first raised in her motion to alter her men. And that being the case, it's set forth in our brief that that issue is not properly reserved for appellate purposes. And thank you for giving me the opportunity to express what— but it is in the brief. Thank you. All right. Thank you. Does anybody else have anything else? Well, good enough. Court may be adjourned.